

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Municipio de Añasco<br><br>Peticionario<br><br>v.<br><br>Administración de Seguros de Salud de Puerto Rico; et al.<br><br>Recurridos | Certiorari<br><br>2013 TSPR 40<br><br>188 DPR \_\_\_\_ |

Número del Caso: CC-2009-671

Fecha: 4 de abril de 2013

Tribunal de Apelaciones:

        Región Judicial de Mayagüez, Panel IX

Abogado de la Parte Peticionaria:

        Lcdo. Raúl Santiago Pérez

Abogado de la Parte Recurrida:

        Lcdo. Alberto de Diego Collar

Materia: Ley de Administración de Servicios de Salud — Beneficios a municipios que prestan servicios de salud; Sentencia Sumaria

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Municipio de Añasco

    Peticionario

       v.                    CC-2009-0671    Certiorari

Administración de Seguros de
Salud de Puerto Rico; et al.

    Recurridos


Opinión del Tribunal emitida por el Juez Asociado SEÑOR ESTRELLA MARTÍNEZ


San Juan, Puerto Rico, a 4 de abril de 2013.

Nos corresponde determinar si los municipios que adquirieron instalaciones médico-hospitalarias del Estado antes de la aprobación de la Ley Núm. 3-2003, *infra*, tienen derecho a que la Administración de Seguros de Salud de Puerto Rico (ASES) comience un proceso de negociación para la modificación y rembolso de las aportaciones realizadas por estos a esa institución para sostener la Reforma de Salud. Para ello, debemos dirimir el alcance de los requisitos que esta ley exige para ser acreedor a los mencionados beneficios.

I

La controversia de autos se originó el 8 de marzo de 2006, cuando el Municipio de Añasco (Municipio) presentó una demanda sobre cobro de dinero, incumplimiento de contrato y daños y perjuicios contra ASES, el Departamento de Salud, el Banco Gubernamental de Fomento (BGF), el Centro de Recaudaciones de Ingresos Municipales (CRIM) y el Secretario de Justicia, en representación del Estado Libre Asociado de Puerto Rico. En su petición, el Municipio alegó que en virtud de las enmiendas introducidas a la Ley Núm. 72-1993, conocida como la Ley de la Administración de Seguros de Salud, 24 L.P.R.A. sec. 7001 *et seq.*, y las disposiciones del Art. 14 de la Ley Núm. 3-2003, 24 L.P.R.A. sec. 3326l, tiene derecho a que la ASES comience un proceso de negociación para la modificación de las aportaciones que realiza al fondo de esa corporación pública para sustentar la Reforma de Salud. Indicó, además, que estas leyes obligan a la ASES a rembolsar a los municipios total o parcialmente los gastos incurridos en la prestación de servicios directos o indirectos de salud cuando son estos los dueños o administradores de las instalaciones médico-hospitalarias. Para sostener su reclamo, explicó que es dueño y administrador del Centro de Diagnóstico y Tratamiento (CDT) que opera en el Municipio y que provee servicios de salud a sus ciudadanos. Sin embargo, al momento de la presentación de la demanda, la

ASES no había comenzado el proceso de negociación que exige la Ley Núm. 3-2003, *supra*.

A base de estos argumentos, solicitó que, de conformidad con la Ley Núm. 72-1993, se ordenara al CRIM retener los pagos que realiza a la ASES a nombre del Municipio y, a su vez, que se ordenara a la ASES rembolsar la suma de $495,000 por cada uno de los años fiscales 2003-2004, 2004-2005 y 2005-2006, más $2,400,000 por los costos de operación del Centro de Salud Familiar que opera y administra.[1]

La ASES contestó la demanda y negó las alegaciones del Municipio. En esencia, planteó que la Ley Núm. 3-2003, no aplica al Municipio dado que este adquirió el CDT antes de que fuera aprobada. Conforme a ello, sostuvo que es improcedente la aplicación retroactiva de la mencionada legislación a favor del Municipio.

El 1 de noviembre de 2006, el Municipio presentó una solicitud de sentencia sumaria. Expuso que no existían hechos medulares en controversia y lo único que restaba era aplicar el derecho según definido en la legislación correspondiente. Específicamente, arguyó que no había controversia en cuanto a que el Municipio adquirió el CDT del Gobierno Central y que ofrecía servicios de salud, directos e indirectos, a su ciudadanía. De esta manera,

---

[1] El 15 de mayo de 2006, el Municipio anunció el desistimiento de la causa de acción contra el Banco Gubernamental de Fomento para Puerto Rico (BGF). Conforme a ello, el Tribunal de Primera Instancia desestimó la demanda contra el BGF mediante una sentencia parcial. Apéndice, pág. 55.

reiteró la teoría esgrimida en su demanda en cuanto a la modificación a las aportaciones a ASES y el rembolso de las sumas por los servicios de salud brindados en el CDT del Municipio.

Por su parte, la ASES presentó una oposición a la solicitud de sentencia sumaria y sostuvo que existían hechos materiales en controversia que impedían la disposición sumaria del pleito. Fundamentalmente, alegó que debía pasarse prueba sobre si los referidos estatutos aplicaban al Municipio pues estos no contenían un lenguaje que permitiera su aplicación retroactiva. No obstante, de concluirse que las leyes eran aplicables, ASES adujo que existía controversia en torno a si el Municipio adquirió el CDT directamente del Gobierno Central. Asimismo, alegó que la Ley Núm. 72-1993 limita el rembolso de las aportaciones a los servicios de salud preventivos prestados por los municipios. En ese sentido, arguyó que existía controversia sobre si el Municipio brindaba este tipo de servicios a sus ciudadanos.[2]

Tras la celebración de una vista sobre el estado de los procedimientos, el Municipio presentó una moción para suplementar su solicitud de sentencia sumaria a la cual anejó tres documentos, a saber: (1) una certificación de la Encargada de la Propiedad del Municipio, Sra. Nancy M. Rodríguez Ruiz, en la que se establece que el Municipio adquirió el CDT de Añasco de la Autoridad de Edificios

---

[2] Véase, Oposición a moción solicitando se dicte sentencia sumaria, Apéndice, págs. 72-88.

Públicos el 4 de octubre de 2000 por $1,000,000.00; (2) una resolución suscrita por la Legislatura Municipal de Añasco mediante la cual se otorgó la autorización al Alcalde a comparecer en representación del Municipio para la compra de las facilidades del CDT; y (3) la Escritura Pública Núm. 22 de 4 de octubre de 2000, sobre compraventa y/o traspaso de titularidad del CDT de Añasco a favor del Municipio.[3]

La ASES compareció nuevamente. Esta vez, con el solo propósito de solicitar la desestimación de la demanda. Principalmente, insistió en su teoría sobre la improcedencia de la aplicación retroactiva de la Ley Núm. 3-2003, *supra*. Junto a su moción, la ASES presentó una carta con fecha de 7 de marzo de 2006, dirigida a la Ex Directora de la Administración de Seguros de Salud, Sra. Nancy Vega Ramos. A través de esta comunicación, la otrora Secretaria del Departamento de Salud, Dra. Rosa Pérez Perdomo, detalló los municipios que cuentan con instalaciones de salud propias. La Dra. Pérez Perdomo destacó que "solo los municipios de Isabela, Maunabo y Trujillo Alto han realizado negocios jurídicos con el Departamento de Salud en virtud de la Ley Núm. 3 de 1 de enero de 2003".[4]

En respuesta, el Municipio presentó una moción a la cual anejó una declaración jurada del entonces Alcalde, Hon. Pablo Crespo Torres. En esta, el primer ejecutivo

---

[3] Véase, Apéndice, págs. 105-120.

[4] Véase, Apéndice, págs. 140-141.

municipal certificó que adquirió las instalaciones del CDT del Gobierno Central para ser utilizadas única y exclusivamente como centro de servicios de salud. Este funcionario juró que desde que se adquirieron las instalaciones médico-hospitalarias, se han ofrecido servicios directos e indirectos de salud a toda la ciudadanía por cuenta propia o mediante contratación privada.[5] Basado en esta declaración, así como en el resto de los documentos sometidos a la consideración del tribunal, el Municipio reiteró que no existían controversias de hechos medulares y lo que restaba era decretar el derecho a su favor.

Luego de recibir sendos memorandos de derecho de las partes, el Tribunal de Primera Instancia acogió la solicitud del Municipio como un recurso de *mandamus*. De ese modo, el 4 de diciembre de 2008, el tribunal primario emitió una sentencia mediante la cual resolvió que la Ley Núm. 3-2003 aplica al Municipio aun cuando este adquirió las facilidades de salud en el año 2000, es decir, 3 años antes de la aprobación de la referida ley. Señaló en su dictamen que la intención legislativa que inspiró la mencionada legislación era, precisamente, liberar a los municipios que adquirieron los centros de salud del Gobierno Central de la carga onerosa que la Ley Núm. 72-1993 había creado. En atención a ello, determinó que el

---

[5]Véase, párrafo núm. 4 y núm. 6 de la Declaración Jurada, suscrita ante el notario Lcdo. Raúl Aquino Figueroa. Apéndice, págs. 166- 167.

Municipio de Añasco cumplió con los requisitos de la Ley Núm. 3-2003 al demostrar que adquirió el CDT del Estado y que ha prestado servicios de salud a sus ciudadanos desde entonces. Consecuentemente, ese tribunal concluyó que el Municipio era acreedor a las modificaciones a sus aportaciones, según estatuido en el Art. 14 de la Ley Núm. 3-2003, *supra*, y del rembolso de los gastos incurridos en servicios de salud, según dispone el Art. VI de la Ley Núm. 72-1993, *supra*. Por consiguiente, y a tenor con lo dispuesto en los aludidos estatutos, el tribunal primario permitió al CRIM retener las remesas correspondientes del Municipio y ordenó a la ASES a comenzar el proceso de negociación para modificar las aportaciones que este realiza a la Reforma de Salud.[6]

Inconforme con el dictamen, la ASES apeló oportunamente ante el Tribunal de Apelaciones. Alegó que el Tribunal de Primera Instancia erró al aplicar retroactivamente la Ley Núm. 3-2003 a favor del Municipio de Añasco. Por otro lado, fundamentó la improcedencia de la sentencia sumaria en que el Municipio no presentó prueba sobre su cumplimiento con los alegados requisitos que impone la mencionada ley, en específico, sobre si este ofrece servicios preventivos de salud, directos o indirectos.

Sopesadas las posturas de las partes, el 27 de mayo de 2009, el foro apelativo intermedio emitió una sentencia

---

[6]Sentencia del Tribunal de Primera Instancia, Apéndice, págs. 20-35.

mediante la cual revocó el dictamen del Tribunal de Primera Instancia. Concluyó que no procedía la disposición del caso por la vía sumaria ya que el Municipio no demostró ser proveedor de servicios preventivos de salud. Con ese tenor, dispuso que el foro primario debía examinar prueba sobre este elemento antes de emitir un dictamen a favor del Municipio.

En desacuerdo con el criterio del Tribunal de Apelaciones, el Municipio de Añasco compareció ante este Tribunal mediante un recurso de *certiorari*. Planteó en su recurso que el foro apelativo intermedio erró al concluir que no existía prueba sobre su cumplimiento con los requisitos de la Ley Núm. 3-2003. Ello, debido a que de los documentos que obran en el expediente surge que este adquirió el CDT del Estado y que, a su vez, ha provisto servicios de salud directa o indirectamente a sus ciudadanos. Además, sostiene que en virtud del Art. 17 de la Ley Núm. 3-2003, *infra*, las disposiciones de ese estatuto son aplicables al Municipio.

El 12 de febrero de 2010, este Tribunal emitió una resolución en virtud de la cual se expidió el auto solicitado y ordenamos a las partes presentar sus correspondientes alegatos.

Con el beneficio de la comparecencia de ambas partes, estamos en posición de resolver.

II

La Reforma de Salud se adoptó mediante la aprobación de la Ley Núm. 72-1993, *supra*, conocida como la Ley de la Administración de Seguros de Salud de Puerto Rico. Esta legislación pretendió ofrecer justicia a la población médico-indigente del país permitiendo que estas tuvieran acceso a un seguro médico de calidad y libre de costo, financiado por el Gobierno.

Mediante esta ley se creó la ASES como una corporación pública con plena autonomía fiscal. Se le asignó la encomienda de gestionar, implantar, administrar y negociar, mediante contratos con aseguradores, un sistema de seguros de salud que eventualmente brindara a todos los residentes de la Isla acceso a cuidados médico-hospitalarios de calidad, independientemente de la condición económica y capacidad de pago de quien los requiriera. *Véase*, Declaración de intención legislativa de la Ley Núm. 72-1993, 24 L.P.R.A. sec. 7001. Asimismo, a la ASES se le adjudicó el deber de establecer mecanismos de control dirigidos a evitar un alza injustificada en los costos de los servicios de salud y en las primas de seguros. Íd.

Con el fin de garantizar un adecuado financiamiento de la Reforma de Salud, la Ley Núm. 72-1993 estableció un sistema de aportaciones municipales para sostener su funcionamiento. A esos efectos, la Sec. 11 del Art. VI de la Ley Núm. 72-1993 dispuso que la asignación presupuestaria de los gobiernos municipales para servicios

de salud directos en áreas cubiertas por los seguros de salud sería negociada con el municipio correspondiente, utilizándose como base la asignación presupuestaria municipal del año fiscal 1993-94 en dólares constantes. 24 L.P.R.A. sec. 7035.

No obstante la designación de ese mecanismo, como forma de financiamiento, el traspaso de los recursos económicos por parte de los municipios a la ASES no se realizó del modo vislumbrado. Ello desató el interés de crear una nueva manera de acarrear fondos a la ASES y obligar a los municipios al cumplimiento de las obligaciones que les impuso la Ley Núm. 72-1993.

Con ese objetivo, el 1 de julio de 1997 la Asamblea Legislativa aprobó la Ley Núm. 29-1997 para enmendar el inciso (d) de la Sec. 11 del Art. VI de la Ley Núm. 72-1993, *supra*, a los fines de establecer un sistema fijo de aportaciones municipales a la ASES. Para ello se utilizó como base un porciento del presupuesto de fondos ordinarios municipales del año fiscal anterior. Asimismo, mediante esta enmienda se facultó al CRIM a retener los fondos ordinarios pendientes de remesar a los municipios para dichas aportaciones.[7]

---

[7]A partir de la aprobación de esta enmienda, el lenguaje de la Sec. 11 del Artículo VI de la Ley Núm. 72-1993 quedó redactado de la siguiente manera:

Sección 11- Financiamiento de la Administración y del plan de seguros de salud; otros ingresos

El Seguro de Salud establecido mediante esta ley y los gastos de funcionamiento de la

Pasados algunos años de la aprobación del sistema de aportaciones fijas, y con el propósito de incentivar a los municipios a colaborar con el sostenimiento de la Reforma de Salud, el 1 de enero de 2003 se aprobó la Ley Núm. 3-2003, 24 L.P.R.A. sec. 3326 *et seq.* Mediante esta legislación se estableció una nueva política pública para permitir al Secretario de Salud, en conjunto con el BGF,

_____

Administración se sufragarán de la siguiente manera:

(a) …
(b) La asignación presupuestaria de los gobiernos municipales para servicios de salud directos en áreas cubiertas por los seguros de salud estará basada en los porcientos contenidos en la Tabla siguiente del Presupuesto de Fondos Ordinarios de los municipios, excluyendo la Contribución Adicional Especial (CAE), y utilizando como base el presupuesto de fondos ordinarios del año fiscal anterior, a partir del 1ro. de julio de 1997.

$0 - $10,000,000..........5%
$10,000,001 - $29,000,000 6%
$29,000,001 - $39,000,000 7%
$39,000,001 - $49,000,000 8%
$49,000,001 - $59,000,000 9%
$59,000,001 - $79,000,000 10%
$79,000,001 - $89,000,000 12%
$89,000,001 - $100,000,000 15%
$100,000,001 en adelante 17%

El Centro de Recaudaciones de Ingresos Municipales, en adelante el CRIM, prorrateará entre las remesas mensuales una cantidad suficiente para satisfacer la aportación que le corresponda a cada municipio de acuerdo al porciento establecido. A partir del 1ro de julio de 1997, retendrá dicha cantidad de cualesquiera fondos ordinarios pendientes de remesar a los municipios y la remitirá en o antes del décimo día de cada mes, a la Administración de Seguro de Salud.
[…]

vender, arrendar, ceder, permutar o enajenar de cualquier otro modo las instalaciones médico-hospitalarias del Departamento de Salud a favor de los gobiernos municipales, corporaciones públicas y/o escuelas de medicina. Exposición de Motivos de la Ley Núm. 3-2003. De esta manera, se derogó la Ley Núm. 190-1996, la cual permitía la venta, cesión, permuta y enajenación de las instalaciones de salud a intereses privados. Esta práctica quedó prohibida expresamente con la aprobación de la Ley Núm. 3-2003. 24 L.P.R.A. sec. 3326n.

La Ley Núm. 3-2003 fue el producto de la implantación de la política pública de mantener en manos del gobierno las instituciones de salud y así garantizar a la ciudadanía la obtención de servicios de salud gratuitos y de calidad. Para cumplir con el objetivo trazado, el Art. 14 de la Ley Núm. 3-2003 ordenó lo siguiente:

> La venta, cesión, permuta, arrendamiento, subarrendamiento o cualquier otro tipo de contratación para la adquisición, operación o administración de instalaciones de salud, conforme a las disposiciones de esta Ley **a favor de cualquier Municipio del Estado Libre Asociado de Puerto Rico, conllevará la modificación de aquella aportación que dicho municipio realice al sistema de beneficencia de salud dispuesto en la Ley Núm. 72 de 7 de septiembre de 1993, según enmendada. La aportación que dicho Municipio contratante realice, será aquella apta y negociada junto con el Secretario, el Banco y ASES, conforme a la situación fiscal del Municipio y la población en dicha región.** 24 L.P.R.A. sec. 3326l. (Énfasis nuestro).

Es de notar que mediante este postulado la Asamblea Legislativa ofreció un incentivo a los municipios para que adquirieran las instalaciones médico-hospitalarias del

Gobierno Central: el derecho a la modificación de sus aportaciones a la Reforma de Salud. Ello se realizaría mediante un proceso de negociación que tuviera como base la situación fiscal del municipio contratante y su población. En otras palabras, en virtud del precitado artículo, el derecho a la modificación de las aportaciones quedó condicionado a que los municipios hayan adquirido sus instalaciones de salud del Gobierno Central mediante un negocio jurídico válido. De cumplirse eficazmente con tal condición, la ASES, el BGF y el Secretario del Departamento de Salud vienen obligados a comenzar las negociaciones con el municipio correspondiente.

Además, la propia Ley Núm. 3-2003 dispuso que **todos los contratos realizados antes de su aprobación, que estuviesen vigentes y fueran cónsonos con las leyes que permitieron su creación, quedarían sujetos, en lo sucesivo, a las disposiciones de esa ley que no fueran inconsistentes con dichos contratos**. Art. 17 de la Ley Núm. 3-2003. 24 L.P.R.A. sec. 3326o. Con la inclusión de este articulado, la Asamblea Legislativa estableció una cláusula para permitir la aplicación de la Ley Núm. 3-2003 a los contratos suscritos antes de su aprobación. Ello, siempre y cuando tales contratos hubiesen sido otorgados válidamente por las autoridades competentes que se detallan en el estatuto.[8]

---

[8]La Ley Núm. 3-2003 establece que los contratos tienen que ser otorgados por la parte contratante y el contratista. "Son partes contratantes el Secretario [de Salud], el Banco [Gubernamental de Fomento] y cualquier entidad pública con interés propietario en dichas instalaciones [de salud]. Si

A pesar de los diversos mecanismos establecidos mediante legislación para procurar la salud fiscal de la Reforma de Salud, estos no fueron suficientes para lograr sus objetivos. Tanto la ASES, como los municipios, incumplían sus obligaciones bajo las leyes 3-2003 y 72-1993, respectivamente. Por un lado, la ASES no comenzaba los procedimientos de modificación de las aportaciones municipales como lo requería la Ley Núm. 3-2003 para aquellos municipios dueños de facilidades médico-hospitalarias. Por otro lado, los municipios manifestaban grandes preocupaciones en torno a su estabilidad fiscal debido al gravamen que las aportaciones fijas implicaban sobre sus presupuestos. En este sentido, los primeros ejecutivos municipales abogaban por la eliminación total de las aportaciones obligatorias al sistema de la Reforma de Salud en vista de que estas redundaban en un descalabro para las arcas financieras municipales. Exposición de Motivos de la Ley Núm. 27-2006.

Por tal razón, y como remedio para paliar la crisis que enfrentaban los municipios con las aportaciones fijas que estableció la Ley Núm. 29-1997, la Asamblea Legislativa aprobó la Ley Núm. 27-2006. Mediante esta se enmendó nuevamente la Sec. 11 del Art. VI de la Ley Núm. 72-1993, *supra*, a los fines de eliminar la aportación fija de los

---

el contrato es con un municipio, corporación pública o escuela de medicina son partes contratistas el alcalde del municipio, cualquier otro funcionario municipal designado por el alcalde a esos fines, el representante de la corporación pública o el presidente de la escuela de medicina, respectivamente". 24 L.P.R.A. sec. 3326k.

municipios y establecer un tope máximo. Para ello se tomó como cantidad máxima la aportación de los municipios para el año fiscal 2004-2005 o el presupuesto anual, cual fuese menor. Art. 1 de la Ley Núm. 27-2006.

A través de la Ley Núm. 27-2006, la Asamblea Legislativa reconoció que, pasados más de dos años de la aprobación de la Ley Núm. 3-2003, las partes obligadas por esta no cumplían con las disposiciones del estatuto. Por tanto, como mecanismo de presión para lograr el cumplimiento de la ley, se autorizó al CRIM a retener el pago de los municipios a la ASES hasta que esa institución acordara la modificación de las aportaciones de aquellos municipios que adquirieron instalaciones médico-hospitalarias del Gobierno Central y brindaban servicios directos e indirectos de salud a su ciudadanía. Así, también, la Ley Núm. 27-2006 obligó a la ASES a rembolsar a los municipios, total o parcialmente, todo gasto incurrido por dichos servicios de salud. Exposición de Motivos Ley Núm. 27-2006. La intención de la Asamblea Legislativa al aprobar esta enmienda se resume en el siguiente extracto de su Exposición de Motivos:

> Esta legislación hace justicia con aquellos municipios de Puerto Rico que prestan servicios directos o indirectos de salud al obligar a ASES a rembolsar de la aportación recibida total o parcialmente todo gasto incurrido por ese servicio sin restricción alguna, ni sujeto a cualquier restricción impuesta por Ley que lo limite.

En consecuencia, la enmienda introducida a la Sec. 11 del Art. VI de la Ley Núm. 72-1993, dispuso lo siguiente:

> El plan de seguros de salud, establecido mediante este capítulo, y los gastos de funcionamiento de la Administración, se sufragarán de la siguiente manera:
>
> […]
>
> En lo que se revisa el esquema de aportación municipal al costo de la Reforma de Salud para el Año Fiscal 2005-2006 y en años fiscales sucesivos, los municipios aportarán la cantidad equivalente al por ciento establecido para el Año Fiscal 2004-2005 o el actual, cual fuese el menor, según dispuesto en su presupuesto. […] Para aquellos municipios que brindan servicios preventivos, ya sean directos e indirectos de salud, el CRIM retendrá el pago a ASES hasta que esta institución acuerde con el municipio la devolución por concepto de la correspondiente aportación de aquellos municipios, según lo requiere la sec. 3326l de este título. **ASES reembolsará total o parcialmente a los municipios todo gasto incurrido por servicios directos o indirectos de salud prestados por los municipios sin restricción alguna.** 24 L.P.R.A. sec. 7035d. (Énfasis nuestro).

Según establecido por la Sec. 11 del Art. VI de la Ley Núm. 72-1993, según enmendada por la Ley Núm. 27-2006, *supra*, el CRIM está facultado a retener las aportaciones correspondientes a la ASES hasta tanto esta última comience el proceso de modificación de las aportaciones de aquellos municipios que cumplen con los requisitos antes discutidos de la Ley Núm. 3-2003. Además, como remedio para alivianar la situación fiscal que enfrentan los municipios dueños u operarios de facilidades médico-hospitalarias, el Art. VI de la Ley Núm. 72-1993, según enmendada, obliga a la ASES a rembolsar de la aportación recibida, total o parcialmente, todo gasto incurrido en la prestación de servicios de salud. De modo que, a partir de la aprobación de la Ley Núm. 27-2006, los municipios dueños u operarios de

instalaciones médico-hospitalarias, adquiridas o arrendadas del Gobierno Central, tienen derecho a que la ASES les devuelva aquella porción de su aportación equivalente a los gastos en los que estos incurran al prestar servicios de salud de forma directa o indirecta a sus ciudadanos. Por consiguiente, el rembolso al que tienen derecho los municipios que cumplan las exigencias de la ley está limitado a la cuantía de la correspondiente aportación para el año en que se solicita su devolución.

Es decir, conforme a las disposiciones de la Ley Núm. 3-2003, *supra*, y la Ley Núm. 72-1993, según enmendada, *supra*, para ser acreedor a las modificaciones de las aportaciones realizadas a la ASES y al rembolso de los gastos incurridos en la prestación de servicios de salud, respectivamente, los municipios deben cumplir con dos requisitos, a saber: (1) haber adquirido una facilidad médico-hospitalaria del Gobierno Central mediante un negocio jurídico válido; y (2) haber brindado servicios de salud a sus ciudadanos de manera directa o indirecta.[9]

---

[9]Entre los servicios a ofrecerse de forma directa o indirecta se encuentran los servicios de salud preventivos. La propia Ley Núm. 72-1993 dispone en la Sec. 8 del Art. VI que estos serán los siguientes: (a) vacunación de niños y adolescentes hasta los dieciocho (18) años de edad; (b) vacunación contra la influenza y pulmonía de personas mayores de sesenta y cinco (65) años de edad, y/o niños y adultos con enfermedades de alto riesgo como enfermedades pulmonares, renales, diabetes y del corazón, entre otras; (c) visitas al médico primario para examen médico general una vez al año; (d) exámenes de cernimiento para cáncer ginecológico, de mama y de próstata, según las prácticas aceptables; (e) sigmoidoscopía para adultos mayores de cincuenta (50) años a riesgo de cáncer de colon. 24 L.P.R.A. sec. 7032.

Una vez se pruebe el cumplimiento por parte de los municipios pertinentes con los mencionados requisitos, la ASES deberá comenzar el proceso de modificación de las aportaciones a las que estos vienen obligados en virtud de la Ley Núm. 3-2003, *supra*. Asimismo, procederá la devolución a estos municipios de todo gasto incurrido en la prestación de servicios directos o indirectos de salud, según instituido por la Ley Núm. 27-2006, *supra*.

## III

Recientemente reiteramos que, como norma general, las leyes no tendrán efecto retroactivo, si no dispusieren expresamente lo contrario. Art. 3 del Código Civil, 31 L.P.R.A. sec. 3; Clases A, B y C v. PRTC, 183 D.P.R. 666, 679 (2011). La retroactividad es, por tanto, la excepción de las leyes. Torres Rodríguez v. Carrasquillo Nieves, 177 D.P.R. 728, 757 (2009); Asoc. Maestros v. Depto. Educación, 171 D.P.R. 640, 648 (2007). Sin embargo, hemos establecido que esta norma solo tiene el alcance de una regla general de interpretación de estatutos, por lo que sus disposiciones no constituyen un principio rígido de aplicación absoluta. Clases A, B y C v. PRTC, *supra*; Vélez v. Srio. de Justicia, 115 D.P.R. 533 (1984); Warner Lambert Co. v. Tribunal Superior, 101 D.P.R. 378, 385 (1973).

Hemos resuelto en el pasado que, aunque de la referida disposición el Código Civil parece imponer el deber de establecer expresamente la retroactividad, esta también puede surgir de la voluntad implícita del legislador. Asoc.

Maestros v. Depto. Educación, *supra*, pág. 648. Esto es, la intención del legislador de darle efecto retroactivo a una ley puede ser expresa o tácita. Torres Rodríguez v. Carrasquillo Nieves, 177 D.P.R. 728, 758 (2009); Consejo Titulares v. Williams Hospitality, 168 D.P.R. 101, 108 (2006); Asoc. Maestros v. Depto. Educación, *supra*, pág. 648. Es por ello que, en circunstancias particulares, procede aplicar retroactivamente una ley aun cuando no se haya expuesto expresamente el efecto retroactivo en su texto, si tal aplicación es la más razonable a la luz del propósito legislativo que la inspiró. Soc. Asist. Leg. v. Ciencias Forenses, 179 D.P.R. 849, 862 (2010); Rullán Rivera v. A.E.E., 179 D.P.R. 433, 445 (2010); *Véase*, además, Díaz v. Srio. de Justicia, 114 D.P.R. 865, 873 (1983); Esso Standard Oil v. A.P.P.R., 95 D.P.R. 772, 785 (1968). Nuestra obligación fundamental es darle efectividad a la intención legislativa con el propósito de que se logre el fin que persigue la ley. Consejo de Titulares v. DACo, 181 D.P.R. 945, 958 (2011); Asist. Leg. v. Ciencias Forenses, *supra*, pág. 862.

A la luz de lo anterior, al evaluar la validez del efecto retroactivo de una ley debe tomarse en consideración principalmente la sustancialidad del interés público promovido por la misma y la dimensión del menoscabo ocasionado por su retroactividad. Vélez v. Srio de Justicia, *supra*, pág. 542; Warner Lambert Co. v. Tribunal Superior, *supra*, pág. 396. Mientras más grave sea el mal

social que el estatuto intenta remediar, más grande es el interés público envuelto y, por tanto, mayor justificación para su aplicación retroactiva. Asoc. Maestros v. Depto. Educación, *supra*, pág. 649; Almodovar v. Méndez Román, 125 D.P.R. 218, 263-264 (1990).

Con ello no obviamos otra regla de interpretación estatutaria, la que dispone que cuando el texto de la ley es claro y libre de ambigüedades, este no debe ser sustituido bajo el pretexto de cumplir su espíritu. Art. 14 del Código Civil, 31 L.P.R.A. sec. 14; Soc. Asist. Leg. v. Ciencias Forenses, *supra*; S.L.G. Rivera Carrasquillo v. A.A.A., 177 D.P.R. 345, 362 (2009). Mas bien reiteramos que, si del texto de la ley o de la intención legislativa que le subyace no surge su aplicación retroactiva, no podemos, en ausencia de circunstancias extraordinarias, ignorar la letra de la ley. Asoc. Maestros v Depto. Educación, *supra*, pág. 650.

IV

Por otro lado, es norma altamente conocida que la sentencia sumaria es un mecanismo procesal que debe utilizarse solo cuando no existen controversias de hechos medulares y lo único que resta es aplicar el derecho. Szendrey-Ramos v. Consejo de Titulares, 184 D.P.R. 133, 167 (2011); Vera v. Dr. Bravo, 161 D.P.R. 308, 333-334 (2004); Corp. Presiding Bishop CJC of LDS v. Purcell, 117 D.P.R. 714, 720 (1986). Este mecanismo está disponible para resolver controversias en las cuales no se requiere la

celebración de un juicio en su fondo. Cordova Dexter v. Sucn. Ferraiuoli, 182 D.P.R. 541, 556 (2011); Abrams Rivera v. E.L.A., 178 D.P.R. 914, 932 (2010); Ramos Pérez v. Univisión, 178 D.P.R. 200, 213 (2010); Pérez v. El Vocero de P.R., 149 D.P.R. 427 (1999).

La Regla 36.2 de Procedimiento Civil de 1979 permite que cualquier parte presente una moción, basada o no en declaraciones juradas, para que se dicte sentencia sumaria a su favor sobre la totalidad o alguna parte de la reclamación.[10] 32 L.P.R.A. Ap. III, R. 36. Al solicitar dicho remedio, la parte promovente de la moción deberá establecer su derecho con claridad y demostrar que no existe controversia sustancial sobre algún hecho material, o sea, sobre ningún componente de la causa de acción. Nieves Díaz v. González Massas, 178 D.P.R. 820, 848 (2010); Ramos Pérez v. Univisión, supra, pág. 213; Vera v. Dr. Bravo, supra, pág. 332. Como es sabido, un hecho material es aquel que puede afectar el resultado de la reclamación de acuerdo al derecho sustantivo aplicable. Szendrey-Ramos v. Consejo de Titulares, supra, pág. 167.[11]

---

[10]Hacemos referencia a las Reglas de Procedimiento Civil de 1979, ya derogadas, debido a que estas eran las vigentes al momento de dictarse sentencia en el presente caso. El análisis es el mismo bajo las nuevas Reglas de Procedimiento Civil de 2009.

[11]Este Tribunal ha resuelto que la controversia sobre el hecho material tiene que ser real. Esto es, que una controversia no es siempre real o sustancial, o genuina. La controversia debe ser de una calidad suficiente como para que sea necesario que un juez la dirima a través de un juicio plenario. Ramos Pérez v. Univisión, supra, a la pág.

De otro lado, la parte que se opone a la disposición del caso por la vía sumaria no podrá descansar solamente en las aseveraciones o negaciones contenidas en sus alegaciones, sino que estará obligada a contestar de forma tan detallada y específica, como la ha hecho la parte promovente. 32 L.P.R.A. Ap. III, R. 36.3; Ramos Pérez v. Univisión, *supra*, pág. 216; Jusino et al. v. Walgreens, 155 D.P.R. 560, 577 (2001). Para eso, la parte opositora estará obligada a demostrar que tiene prueba para sustanciar sus alegaciones. Abrams Rivera v. E.L.A., *supra*, pág. 933; Jusino et al. v. Walgreens, *supra*, págs. 577-578. Sin embargo, la omisión en presentar evidencia que rebata aquella presentada por el promovente, no necesariamente implica que procede dictar sentencia sumaria de forma automática. Córdova Dexter v. Sucn. Ferraiuoli, *supra*, pág. 556; González Aristud v. Hosp. Pavía, 168 D.P.R. 127, 138 (2006).

La sentencia sumaria procederá si el tribunal queda claramente convencido de que tiene ante sí, de forma no controvertida, todos los hechos materiales pertinentes y de que, por lo tanto, una vista en los méritos resulta innecesaria, procederá dictar sentencia sumariamente. Cordova Dexter v. Sucn. Ferraiuoli, *supra*, pág. 555; S.L.G. Szendrey-Ramos v. Consejo de Titulares, *supra*, pág. 166; Abrams Rivera v. E.L.A., *supra*, pág. 932. El principio rector que debe guiar al juzgador en la determinación sobre

_____
214, citando a P.E. Ortiz Álvarez, *Hacia el uso óptimo de la sentencia sumaria*, 3 (Núm. 2) Forum 3, 8 (1987).

si procede o no la sentencia sumaria es el sabio discernimiento, ya que mal utilizada, puede prestarse para privar a un litigante de su "día en corte", principio elemental del debido proceso de ley. <u>Cruz Marcano v. Sánchez Tarazona</u>, 172 D.P.R. 526, 550 (2007); <u>E.L.A. v. Cole,</u> *supra*, pág. 627; <u>Roig Com. Bank v. Rosario Cirino</u>, 126 D.P.R. 613 (1990).

Establecido el marco legal anterior, veamos su aplicación a los hechos del presente caso.

V

El Municipio aduce ante esta Curia que el foro intermedio erró al revocar la sentencia sumaria dictada por el Tribunal de Primera Instancia debido a que de los documentos anejados a su solicitud se desprende que este cumple con los requisitos de la Ley Núm. 3-2003, *supra*, y la Ley Núm. 72-1993, *supra*. Por tanto, sostiene que es acreedor de los beneficios que proveen estas legislaciones a los municipios que operan instalaciones médico-hospitalarias y proveen servicios directos o indirectos de salud.

Por su parte, la ASES entiende que la Ley Núm. 3-2003 no debe aplicarse al Municipio de Añasco pues constituiría una aplicación retroactiva y dicha intención no surge del texto del estatuto. Al respecto, señala que la carta suscrita por la que fuera Secretaria del Departamento de Salud, Dra. Pérez Perdomo, certifica que el Municipio de Añasco no adquirió las instalaciones médico-hospitalarias

en virtud de la Ley Núm. 3-2003, *supra*, sino antes de su aprobación. De otro lado, alega que la prueba que obra en el expediente es insuficiente para dictar sentencia sumaria, pues no demuestra el cumplimiento del Municipio con los requisitos de la mencionada ley. Específicamente, expone que el Municipio no ha demostrado ser proveedor de servicios de salud preventivos. Veamos.

Como cuestión de umbral, debemos determinar si la Ley Núm. 3-2003, y la Ley Núm. 72-1993, según enmendada mediante la Ley Núm. 27-2006, *supra*, son aplicables al Municipio de Añasco. Esta interrogante, de su faz, plantea una controversia de derecho, la cual resolvemos en la afirmativa.

En lo pertinente al caso que nos ocupa, el Art. 17 de la Ley Núm. 3-2003, *supra*, establece:

> Los contratos vigentes y cónsonos con las leyes que permitieron su creación, **otorgados con anterioridad a la vigencia de esta ley, quedarán sujetos, en lo sucesivo, a las disposiciones de [esta Ley] que no sean inconsistentes con dichos contratos.** 24 L.P.R.A. sec. 3326o. (Énfasis nuestro).

A tenor con el precitado texto, es innegable que el legislador, al aprobar la Ley Núm. 3-2003, contempló precisamente escenarios como el de autos- en el cual ya existía un contrato entre un municipio y el Gobierno Central para la operación de instalaciones médico-hospitalarias- y decidió sujetar los mismos a las disposiciones de la ley. Ello, siempre y cuando los respectivos contratos se hayan efectuado acorde a las leyes

que así lo permitían. En virtud de este artículo, las partes que otorgaron contratos antes de la vigencia de la Ley Núm. 3-2003, pero cónsonos con las disposiciones que esta introdujo a nuestro ordenamiento, advinieron acreedoras, desde su aprobación, a los beneficios que en ella se instituyeron. Por ende, según este postulado, si el Municipio de Añasco demuestra que adquirió el CDT mediante un negocio jurídico válido al momento de su otorgación, es indiscutible que esta ley debe aplicársele.

Si bien lo anterior es suficiente para derrotar la contención de la ASES, cabe destacar que la propia Exposición de Motivos de la Ley Núm. 3-2003 revela la intención legislativa de que esta aplique a los contratos cónsonos con sus fines, aunque estos se hubieran otorgado antes de su aprobación. Mediante este estatuto la Asamblea Legislativa pretendió proveer un mecanismo rentable para incentivar a los gobiernos municipales a adquirir los centros de salud del Gobierno Central y prohibir, a su vez, la venta o cesión de estos a manos privadas. A esos fines, se diseñó un esquema para permitir la modificación de las aportaciones que los municipios realizaban a la Reforma de Salud, si estos adquirían las facilidades médico-hospitalarias y se comprometían a brindar tales servicios a su ciudadanía. Es decir, el interés público que persiguió la Asamblea Legislativa al aprobar la Ley Núm. 3-2003, *supra*, era devolver el control de los centros de salud a los municipios y, de esa manera, promover que fueran estos

los responsables de brindar servicios de salud de calidad a sus ciudadanos.

A base de lo anterior, resolvemos que, si queda demostrado que el Municipio adquirió el CDT del Gobierno Central para ofrecer servicios de salud directa o indirectamente a sus ciudadanos, este cumplió con el requerimiento dispuesto por la Asamblea Legislativa al aprobar la Ley Núm. 3-2003, *supra*. De ser ese el caso, los beneficios que concede esta legislación deben favorecerle. Alcanzamos la anterior conclusión a base de la intención legislativa que inspiró la Ley Núm. 3-2003, y como parte del ejercicio de interpretación del Art. 17 antes discutido, en el cual anclamos principalmente nuestra adjudicación.

A tenor con ello, cabe discutir la Exposición de Motivos de la Ley Núm. 27-2006, *supra*, de la cual surge diáfana la intención legislativa de hacerle justicia a los municipios que brindaban servicios de salud a sus ciudadanos y realizaban las debidas aportaciones a la Reforma de Salud sin recibir a cambio los beneficios conferidos por la Ley Núm. 3-2003, *supra*. La Ley Núm. 27-2006 se aprobó para proveer a estos municipios un mecanismo de presión que permitiera al CRIM retener las remesas correspondientes a la ASES hasta tanto esta cumpliera con su deber de modificar las aportaciones municipales, según disponía la Ley Núm. 3-2003, *supra*. De este modo, la enmienda introducida mediante la Ley Núm. 27-2006 al Art.

VI de la Ley Núm. 72-1993, creó un esquema obligacional integrado para que tanto la ASES como los municipios cumplieran con sus respectivas responsabilidades bajo la Ley Núm. 3-2003 y la Ley Núm. 72-1993, *supra*. Es por ello que ambas leyes deben interpretarse conjuntamente, pues el cumplimiento con la segunda conlleva, necesariamente, el cumplimiento con la primera. En otras palabras, al concluir que la Ley Núm. 3-2003 aplica al presente caso, es consecuente la aplicación de la Ley Núm. 72-1993, según enmendada.

De conformidad con ello, entendemos que la intención legislativa que inspiró tanto la Ley Núm. 3-2003, como la Ley Núm. 27-2006, *supra*, fue el interés de hacerle justicia a los municipios que aportaban económicamente al sostenimiento de la Reforma de Salud y que, de forma contraria, experimentaban dificultades fiscales para sostener eficientemente los servicios esenciales que debían brindar a sus ciudadanos. Ciertamente, este interés constituyó para el legislador una razón de envergadura para aplicar las disposiciones de la Ley Núm. 3-2003 a los contratos suscritos antes de su aprobación. Así lo hizo mediante la inclusión del Art. 17 del estatuto, *supra*.

Por las antedichas razones, concluimos que las disposiciones de la Ley Núm. 3-2003, son aplicables a todos los municipios que adquirieron facilidades médico-hospitalarias del Gobierno Central mediante un negocio jurídico válido y brindan en estos servicios directos o

indirectos de salud. Ello, aun cuando tal adquisición se haya efectuado antes de la aprobación de esta Ley. Es decir, a partir de la vigencia de la Ley Núm. 3-2003, *supra*, estos municipios son acreedores a la modificación de sus aportaciones a la Reforma de Salud. Ahora bien, es a partir de la aprobación de la Ley Núm. 27-2006 que los mencionados municipios tienen derecho al rembolso- dentro de los límites de la aportación municipal- de todos los gastos incurridos en la prestación de servicios de salud.

## VI

Antes de disponer del presente caso, debemos evaluar si el Municipio de Añasco demostró haber cumplido satisfactoriamente con los requisitos dispuestos en la Ley Núm. 3-2003, *supra*, a los fines de ser acreedor de la modificación de sus aportaciones a la Reforma de Salud y del rembolso de los gastos incurridos en la prestación de servicios de salud; a saber, (1) si este adquirió las facilidades médico-hospitalarias del Gobierno Central; y (2) si ofrece servicios de salud, directa o indirectamente.

En cuanto al primer requisito, surgen de los autos varios documentos que demuestran que, en efecto, el Municipio cumple con este. Junto a su solicitud de sentencia sumaria, el Municipio presentó una resolución de la Legislatura Municipal mediante la cual se autorizó al Alcalde a comprar, a nombre del Municipio, las facilidades médico-hospitalarias de Añasco pertenecientes en ese momento a la Autoridad de Edificios Públicos del Gobierno

Central. Asimismo, se adjuntó una copia de la Escritura Núm. 22 de 4 de octubre de 2000, contentiva del negocio jurídico mediante el cual se adquirieron las facilidades y equipo médico del CDT de la mencionada corporación pública.

En la Escritura Núm. 22 se hace referencia a la ley que permitió su otorgación, Ley Núm. 190-1996, según enmendada. Como ya establecimos antes, mediante esta ley se permitió al Gobierno Central vender, traspasar o ceder sus facilidades médico-hospitalarias a intereses privados. Es decir, el contrato de compraventa de las facilidades médico-hospitalarias del Municipio de Añasco se efectuó de conformidad con la ley que permitió su creación.

Asimismo, este negocio jurídico es cónsono con los postulados de la Ley Núm. 3-2003, *supra*. En primer lugar, el contrato se otorgó por las partes que la referida ley exige, estas son, una corporación pública con interés propietario en las instalaciones de salud (Autoridad de Edificios Públicos) como parte contratante, y el gobierno municipal, representado por su Alcalde, como parte contratista. 24 L.P.R.A. sec. 3326k. Así, también, en el acuerdo se incluyeron cláusulas de adquisición preferente y retracto a favor del Gobierno Central en caso de que el Municipio opte por vender o disponer de alguna forma de las instalaciones médico-hospitalarias. Este último criterio cumple con los requisitos que establece la Ley Núm. 3-2003. 24 L.P.R.A. sec. 3326m. Por lo tanto, de acuerdo al lenguaje del Art. 17 de la Ley Núm. 3-2003, *supra*, dicho

negocio jurídico, válido en su origen y vigente al momento de aprobarse dicha legislación, quedó sujeto, en lo sucesivo, a las disposiciones de esa ley. Entre estas, el derecho a que se modifiquen las aportaciones que el Municipio realiza a la Reforma de Salud. Art. 14 de la Ley Núm. 3-2003, *supra*.

Para rebatir lo anterior, la ASES presentó una carta de la que fuera Secretaria del Departamento de Salud en la que se expresa que solo los municipios de Isabela, Maunabo y Trujillo Alto realizaron negocios jurídicos con esa agencia en virtud de la Ley Núm. 3-2003. Sin embargo, la interpretación que la ASES pretende que se le otorgue a dicha comunicación es incompatible con el Art. 17 de la Ley Núm. 3-2003, *supra*, y resulta contraria a los propósitos legislativos que propiciaron la aprobación de la mencionada legislación. Concluir que los tres municipios indicados son los únicos acreedores a los beneficios de la Ley Núm. 3-2003, constituye una interpretación errónea, que pasa por alto el alcance del Art. 17, el cual ordena, sin lugar a dudas, reconocer la existencia de los contratos otorgados antes de su aprobación, para fines de la adecuada aplicación de esta ley. Además, tal interpretación ignora el interés público plasmado en ella, dirigida a hacer justicia a todos los demás municipios que han adquirido instalaciones médico-hospitalarias y han brindado servicios de salud a sus ciudadanos durante todos los años que ha estado en vigor la Ley Núm. 72-1993, según enmendada,

*supra*. Es por ello que esta carta no tiene el efecto de rebatir el hecho establecido por la Escritura Pública Núm. 22 y el resto de los documentos presentados al respecto. Por consiguiente, es un hecho incontrovertido que el Municipio adquirió sus facilidades médico-hospitalarias del Gobierno Central, según lo requiere la Ley Núm. 3-2003, *supra*.

Como segundo requisito para ser acreedor al rembolso, dentro de su aportación, de los gastos incurridos en la prestación de servicios de salud, acorde a la Ley Núm. 72-1993, según enmendada, *supra*, debemos determinar si el Municipio, además, provee servicios de salud directa o indirectamente a su ciudadanía. En cuanto a este elemento, la ASES plantea que la Sec. 11 del Art. VI de la Ley Núm. 72-1993, *supra*, requiere que los servicios que se ofrezcan sean exclusivamente de naturaleza preventiva. No tiene razón.

Para sostener su contención, la ASES descansa en el lenguaje de la Sec. 11 del Art. VI de la Ley Núm. 72-1993, según enmendada, el cual expresa, en lo pertinente:

> […] Para aquellos municipios que brindan servicios preventivos, ya sean directos e indirectos de salud, el CRIM retendrá el pago a ASES hasta que esta institución acuerde con el municipio la devolución por concepto de la correspondiente aportación de aquellos municipios, según lo requiere la sec. 33261 de este título. **ASES reembolsará total o parcialmente a los municipios todo gasto incurrido por servicios directos o indirectos de salud prestados por los municipios sin restricción alguna.** 24 L.P.R.A. sec. 7035. (Énfasis nuestro).

El enunciado de este artículo es claro en cuanto a que el rembolso a los municipios será de todos los gastos incurridos por servicios de salud directos o indirectos, sin restricción de clase alguna. Igual conclusión se deriva de la Exposición de Motivos de la Ley Núm. 27-2006, mediante la cual se enmendó el Art. VI de la Ley Núm. 72-1993, *supra*, para introducir el inciso antes trascrito. En esta se dispuso:

> El 3 de enero de 2003 esta Asamblea Legislativa aprobó la Ley Núm. 3, la cual le permite a ASES devolver **cualquier aportación que paguen los municipios cuando este lleve servicios directos o indirectos de salud a su municipio.** Pasado[s] cerca de dos (2) años de la aprobación de esta medida las entidades obligadas por esa Ley no han modificado el balance a ser devuelto a los municipios dentro de su aportación. A tenor con lo anterior se autoriza mediante esta Ley a que el Centro de Ingresos Municipales retenga el pago a ASES que paga el municipio hasta que esta institución acuerde la devolución por concepto de la correspondiente aportación **de aquellos municipios que brindan servicios directos e indirectos de salud.** Esta legislación hace justicia con aquellos municipios de Puerto Rico que prestan **servicios directos o indirectos de salud al obligar a ASES a rembolsar de la aportación recibida total o parcialmente todo gasto incurrido por dicho servicio sin restricción alguna, ni sujeto a cualquier restricción impuesta por Ley que lo limite.** Exposición de Motivos Ley Núm. 27-2006. (Énfasis nuestro).

Claramente surge de la Exposición de Motivos antes reseñada que no fue la intención de la Asamblea Legislativa limitar la aplicación de dicha ley a solo aquellos municipios que prestan servicios de salud preventivos. En esta exposición de la intención legislativa no se califica de modo alguno el tipo de servicio de salud que habrá de

ser rembolsado al amparo del Art. VI de la Ley Núm. 72-1993, según enmendada. Acorde con estas expresiones, el rembolso al que tiene derecho todo municipio que haya adquirido facilidades médico-hospitalarias del Gobierno Central es sobre aquella porción de su aportación que equivalga a los gastos incurridos en la prestación de servicios de salud en general, directos o indirectos, sin calificación ni restricción alguna. Y es que tiene que ser así, pues de otro modo se frustrarían los fines para los cuales se aprobó esta legislación y la Ley Núm. 3-2003, que era traspasar a los Municipios la carga de proveer servicios de salud a los ciudadanos que antes pesaba sobre el Gobierno Central. Al disponer que la devolución sea de "todo gasto incurrido" en concepto de servicios de salud prestados, sin limitación ni restricción alguna, se adelanta este fin. Por un lado, se libera al Gobierno Central de la obligación de sufragar los servicios de salud de la población y, de otro lado, los Municipios encuentran un incentivo para brindar tales servicios al reconocer que la ASES les devolverá, total o parcialmente, las aportaciones realizadas. Limitar la devolución de las aportaciones a solamente los servicios de salud preventivos resultaría en un contrasentido de la intención legislativa y la propia letra del Art. VI de la Ley Núm. 72-1993, *supra*.[12]

---

[12]Como cuestión de hecho, mediante la Resolución Conjunta Núm. 144-2012 de 22 de julio de 2012, R.C. de la C. 1011, la Asamblea Legislativa de Puerto Rico aprobó el

Establecido lo anterior, debemos evaluar si existe prueba en el expediente que nos permita concluir que el Municipio brinda servicios de salud directa o indirectamente. Veamos.

De la declaración jurada suscrita por el entonces Alcalde del Municipio de Añasco, Hon. Pablo Crespo Torres, surge que el Municipio compró el CDT para proveer exclusivamente servicios de salud y que desde su adquisición los ha brindado, directa e indirectamente. Así también lo enuncia la Escritura Pública Núm. 22 sobre compraventa en su cláusula tercera, inciso uno:

> One: Use of Property as Health Care Facilities.
> […] [T]he property shall be used exclusively to provide comprehensive services by means of a managed health care environment or by any other standard method of providing general hospital health care services […]. Apéndice, pág. 118.

A pesar de las manifestaciones realizadas en ambos documentos, estas resultan insuficientes para probar el hecho de que el Municipio ofrece servicios de salud directos o indirectos a sus ciudadanos.

_____

traspaso del Centro de Diagnóstico y Tratamiento del municipio de Las Piedras, perteneciente hasta ese momento al Departamento de Salud, a favor de la Administración del mencionado Municipio, para su desarrollo administrativo y prestación de servicios de salud al pueblo pedreño. Por ser de gran pertinencia a la interpretación que hoy adoptamos, es preciso señalar que la aludida Resolución establece en su Sec. 5 que "*se exime a la Administración del Municipio de Las Piedras del pago por concepto de la aportación a la Administración de Servicios de Salud de Puerto Rico, según se dispone en la Ley 72-1993, según enmendada, conocida como 'Ley de la Administración de Seguros de Salud de Puerto Rico'*". De esta manera, la Asamblea Legislativa eximió al Municipio de Las Piedras de **toda** aportación a ASES, sin limitarla de manera alguna a servicios preventivos o de otro tipo.

En primer lugar, la declaración jurada suscrita por el entonces Alcalde fue presentada ante el tribunal primario con el propósito de demostrar la titularidad del CDT, no para probar los servicios que allí se brindan. Sin embargo, en alguna de sus cláusulas se expresa que el CDT del Municipio se adquirió para utilizarse como centro de salud, y que así se ha hecho desde su adquisición. No obstante, en esta declaración no se describen los servicios de salud que se prestan en el CDT, como tampoco explica de qué manera estos servicios son brindados. En ella, el Alcalde se limitó a repetir, de manera literal, los requisitos que dispone la Ley Núm. 72-1993, sin exponer con hechos particulares las características de los servicios que se brindan en el CDT y cómo estos cumplen los requerimientos de la referida ley. Resulta imperativo que se ofrezca información más certera por personas cualificadas que puedan emitir declaraciones objetivas en torno al tipo y manera de prestación de servicios que se lleva a cabo en el CDT.

Por otro lado, aunque la Escritura Pública Núm. 22 establece que el CDT se adquirió para ser utilizado como centro de salud municipal, esta data del año 2000, por lo que no la podemos acoger como un documento que refleja el funcionamiento actual de esas instalaciones. La información allí contenida describe la utilización que las partes acordaron para esas facilidades, pero ello es insuficiente para concluir que, en efecto, estas se han dedicado a esos

fines sin interrupción desde el momento en que fueron adquiridas hasta el presente. Por ende, esta escritura tampoco posee el valor probatorio necesario para establecer la inexistencia de controversias sobre el aludido hecho.

Por último, debemos recordar que el Municipio reclamó en su demanda sumas por concepto de servicios de salud prestados en el Centro de Salud Familiar, ascendentes a $2,400,000.00. Sin embargo, el expediente no contiene evidencia alguna que pruebe la naturaleza de los servicios allí brindados. Esta es, evidentemente, una controversia de hechos que debe dilucidarse antes de emitirse un dictamen.

Al resolver un caso de tan alto interés público como el presente, por conllevar el manejo de fondos públicos dedicados a la salud de todos los puertorriqueños, debemos tener ante nos toda la información necesaria para poder concluir satisfactoriamente que no existen controversias de hechos medulares. Obviar lo anterior resultaría en una decisión arbitraria, negándole a una de las partes la oportunidad de su día en corte. No debemos ceder a tan pobre ejercicio de nuestra jurisdicción. Es por ello que la prudencia nos convence que debemos ordenar la celebración de un juicio plenario que permita al foro primario recibir y sopesar evidencia con mayor valor probatorio para derrotar las dudas en torno a los hechos materiales que presenta el caso ante nos.

VII

En consideración a los fundamentos antes discutidos, se modifica la sentencia del Tribunal de Apelaciones y se ordena al Tribunal de Primera Instancia celebrar el correspondiente juicio acorde a los pronunciamientos que forman parte de esta opinión.

Se dictará sentencia de conformidad.


                                        Luis F. Estrella Martínez
                                             Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Municipio de Añasco

    Peticionario

       v.               CC-2009-0671     Certiorari

Administración de Seguros de
Salud de Puerto Rico; et al.

    Recurridos

SENTENCIA

San Juan, Puerto Rico, a 4 de abril de 2013.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se modifica la sentencia del Tribunal de Apelaciones y se ordena al Tribunal de Primera Instancia a celebrar el correspondiente juicio acorde a los pronunciamientos que forman parte de esta opinión.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo